Good morning. May it please the Court. My name is Christian Knox and I'm the attorney for the appellants. I have with me today Ms. Colleen Snyder. I'd like to reserve three minutes for rebuttal, if possible. There are three reasons that the lower court's decision should be reversed in this case. First, the procedural violations were amounted to a denial of due process. That denial of a free appropriate public education. Second, the August 2, 2012 IEP and subsequent amendments were not reasonably calculated to provide M.C. with educational benefit in all areas of suspected disability or unique need based upon the assessment data that we had from Dr. Biggs and Dr. Patterson. And third, the issue of the adequacy of the services from the teacher of the My client's rights to due process were violated in this case because respondents failed to provide notice or otherwise respond as required by the IDEA. 20 U.S.C. 1415 states that the district must file a response to the complaint. They did not do so. As a result, we had no notice of their position until we passed an IEP amendment that had not previously been provided or identified in any documents. Not only that, but throughout the testimony, we did. Did you seek a continuance at that point? Did not seek a continuance at that point, Your Honor. At that point. I mean, you could have, right? We could have requested a continuance, but the continuance would have had no effect on the presentation of our case. The issue wasn't the continuance. The issue was not the admissibility of the document itself. That was not the issue. The issue was that the creation of that document outside of an IEP team meeting, outside of any input by anyone other than the program specialist who wrote it, was a denial of meaningful participation in the IEP process. I'm sorry. I'm trying to understand your argument. You said they didn't file a response. Correct. Okay, and you were denied due process. You were denied meaningful participation because they don't file a response. Correct. Okay. I mean, that could have been cured by asking for a continuance, right? Asking them to file a response at that point. Did they ever file a response? No, Your Honor. They did not. So you were surprised what happened at the hearing. Completely surprised. So if you're surprised, you can ask for more time saying we're surprised, we want more time to prepare now that we understand the case. But the more time to prepare would not have assisted in the presentation of the case. The more time to prepare wasn't the issue. So you're not arguing that you didn't have an adequate time to prepare, you didn't give a response, you didn't have time to prepare. No, it's not the time to prepare, it's the complete lack of understanding of where the district was coming from, what their position was going to be, and how their position changed. But eventually understood it, right? Eventually understood what it was. Correct. Eventually we understood what it was. So what's the harm there? Well, I think that we have a right to notice. My client has a right to notice. Well, that's what I said, you could have asked for more time. You could have said now we understand what they want, what their position is, we want more time to prepare to respond to it. Right? We could have, yes. And you didn't do that? We did not do that, no, Your Honor. Okay. Why is there a waiver of that claim? The failure to ask for more time saying, look, we're surprised, we don't, you know, didn't find a response, we can't go forward because we don't have notice, we didn't have notice, we need to prepare. You choose to go forward. By the time that we figured out what the district's position was, we were well into the hearing. And at that point, it would have been prejudicial to my client. We had retained experts. You could certainly have asked for a continuance and said, look, we're entitled to a response, they haven't found a response, we ask for a response and to go forward, not to go forward with the hearing until we get a response and we understand what their position is. You could have done that. We could have attempted to do that, Your Honor. You could have asked for it. If you'd asked for it and been denied, then you'd have, then you'd be able to appeal that. But you didn't do that. No, we did not. No, we did not. We proceeded with the hearing for the benefit of the student. Was it an emergency? I mean, it was a something that would have made asking for continuance harmless? In my view, there was. He was starting freshman year of high school. It's a critical time to have his IEP fully developed and a program to be administered to him so that he can be working on the goals and receiving the services that he needed to obtain to proceed through his high school career, and it was critical for us to proceed at that point. Okay, you've got several other points. I do. And a third of the time can't. Okay. So the procedural violations were not only the failure to provide the response, but the failure to document services in the IEP, the failure to document the assistive technology devices and equipment. Well, let me ask you about that. You said one of the problems was that they presented an amendment to the IEP at the hearing. Correct. Explain to me how that worked. I thought that all IEP, including IEP amendments, are supposed to be provided to the parents as they happen. They are. They are, Your Honor. That IEP amendment appeared in the evidence packet that we were provided on the first day of hearing, and that was the first time either myself or my client had seen that. And it was interesting to note that that IEP amendment was not identified in the district's pre-hearing conference statement in their list of exhibits. So we had no prior knowledge that this IEP amendment even existed until we received the document. And you objected to it? We objected to it, but the administrative law judge ultimately continued the case which would resolve the five day rule on the admissibility of the evidence. So it was still deemed admissible, which I did consent to. It was admissible document at that point once the hearing had been continued. I'm sorry, you objected to it on the ground that you didn't have five days notice? Initially we did, Your Honor. But did you object to it on the ground that this was the proper IEP amendment? We did raise that. Or at least your position is that it wasn't a proper IEP amendment? It wasn't a proper IEP amendment, and we did raise that in our closing brief and throughout the hearing we had testimony on that issue, that it wasn't a proper amendment. And what did the ALJ say about that? The ALJ said that it was a typographical error that had been corrected, and that it was not necessary for an IEP team meeting. It was not necessary that it continue, that there be a full IEP team meeting, that it was merely a typographical error that had been positioned. And what was interesting to note, though, is that that typographical error that was allegedly corrected was not what the testimony revealed was being actually provided to the student, or allegedly provided to the student. So it was inconsistent with the testimony as to what the student was receiving. So there really was this whole lack of understanding from my client's part, and participating in the process, when she had no idea what her son was receiving. No idea, until we get into the testimony and get the service logs. And once we obtained the service logs, we could tell what was actually being implemented, which was not either what was in the IEP amendment, nor consistent with the testimony of the teacher, the visually impaired, who was providing the that was unclear how it was calculated. No one knew what was being provided except the teacher of the visually impaired. The program specialist who wrote the IEP amendment didn't know, because she put 240 minutes in as the weekly service. And Ms. Knitter, the person providing the services, testified that she was providing 300 minutes per week, which was not consistent with any document. And then her own service logs showed that she was not in fact providing 300 minutes per week, but was providing less than that. So what was the typographical error, or the error was the change from months to week? Yes. So the IEP, the original IEP said 240 minutes a month. Correct. And then was it amended? It was amended on September 17th. So it was amended. You know, that tells me nothing whatsoever. You know, you have to put it in relation to other things. A date like that doesn't help. There was an IEP meeting when? When was in relation between the IEP meeting and the hearing? When was this amended? The amendment, the IEP meeting was August 2nd, and the amendment was September 17th, and the hearing commenced on October 9th. Okay, and was your client, was your client given a copy of the amendment? My client was given a copy of the amendment on the first day of hearing. Not on the 17th? No, not on the 17th. Every other document provided by the district to my client had gone through my office as well, and this one did not. And how do you claim that this harmed you, harmed your client? Because she was not allowed to participate in the process. She had no meaningful opportunity to engage in the discussion about what the service level would be. She had no ability to just discuss it with the district. I mean, the whole idea is to maintain open communication, and there was no open communication because the district held this document and never provided it to my client. But the ALJ finds this is a typographical error. They just corrected the typographical error. This was supposed to be able to begin with. That's what the ALJ found, yes. But that was not what, that was not what the original IEP said, and that was not what the testimony revealed. So it was very unclear as to where this amendment came from and why it wasn't disclosed prior to October 9th. When did the school year actually begin, this ninth grade year? I believe the school year began on August. It was the first week of August. I'm not sure if it was... So this was sort of taking place as he was beginning high school? Correct. When we were at hearing, we were nine weeks into school. Okay. The school had been in session for nine weeks. Regarding the assistive technology piece, the district claimed that they just needed to correct a typographical error changing the box that marked no to yes, but that's not what's required by the law. The law requires that they specifically identify the equipment, the services, and the software to be delivered to the student, and this was critically important because somebody has to implement that. And when the IEP is blank, there's nobody knows what's supposed to be implemented. My client certainly didn't know what he was supposed to be provided. And this not only impacted her ability to meaningfully participate in the process, but she also then was denied access to enforcement. So there was no way for her to enforce any type of assistive technology that was supposed to be provided. And in fact, the evidence showed that at the time of the hearing, almost two months into school, he still had not received some of the assistive technology equipment and software he was supposed to be provided. And again, what was he, so how did you know what he was supposed to be provided if they didn't put down what he was supposed to be provided? We didn't know. We only knew through the testimony as it came out during the hearing as to what was supposed to be provided. And then they later, Ms. Knitter would testify that she did not provide it, that it had not been yet installed. So I'm sorry, this was not in the IEP? What technology was provided? Right. What did the IEP say about assistive technology? Yes. What did it say? It said yes. Does the student require assistive technology? And they checked the box yes. But it didn't specify what it would be? Correct. Correct. You have about one minute left. Do you want to save it? I'll save it. You didn't reach the substantive question. I did not reach the substantive issue. That is correct, Your Honor. Thank you. Good morning, Your Honors. My name is David Seeley and I represent the Antelope Valley Union High School District in this case. May it please the Court, I'd like to add a couple of facts or items of record to give some context for a couple of the arguments that were just made. The first is this, that the hearing at which counsel says they were presented for the first time on the first day of the hearing with such-and-such document, that was on October 9th, and my client moved for a continuance and it was unopposed. I don't know that it was stipulated to, but it was unopposed, certainly. And I think that gave them adequate time to deal with whatever they wanted. Was there ever a response of pleading filed? As far as I know, no. Then why not? I have no idea. We didn't handle that stage of the proceeding. Why isn't that itself a defect that requires setting the whole thing aside? I mean, they're entitled to, just like a plaintiff is entitled to an answer, why isn't a student that moves for due process entitled to and files a complaint entitled to a response that sets forth the other side's position? And why doesn't that render everything that happens afterwards in the absence of that? It gives a tremendous amount of freedom to the school district to come up with anything at all at the hearing, because you haven't been locked into any writing that gives no aside as to what you're going to argue. Well, why isn't that the end of the case? Why don't we need to send this back to have you guys file a response and have a hearing, you know, with a level playing field? Well, my question would be, why do they not? Well, but I asked the question first, and so why don't you answer my question, and then we'll think about whether we're going to let you ask a question. Answer will probably be no. I beg your pardon. I think everything... Mine was a why question, so you can't answer it no. No, no, I meant the answer to whether we will let him ask a question. Oh, I think you probably know. Yeah. So why don't you answer my question? I don't think there's any suggestion that the issues have not been fully fleshed out. You have rules of the game. The rules of the game is they file a complaint or they file a pleading. You're supposed to respond. Respond gives them notice and also limits what the other side can bring. I mean, that's sort of the way the rules are played. It's not just in due process hearings. It happens in courts all over the country. You all of a sudden decide we're not going to play by those rules, and the ALJ lets you get away with it. Why isn't that just the kind of thing we are saying? No, you just don't do that. If you're going into a due process hearing, you have to adhere by due process, and due process means you lock yourself into a position that the other side can then prepare to deal with a trial, instead of throwing a bunch of documents on the first day and saying, give me a continuance. And were I in the position of a plaintiff, I would move for a default. Or maybe we should just give them a default. Yeah, maybe we should just enter a default now. I think they have, in effect, waived it. I'm not moving for a default. Well, maybe not. I mean, at the very least, we have to send it back for a fair hearing, right? You agree to that, don't you? I do not. Well, why not? Why not? I mean, I've never heard of it. I mean, I've been sitting here for over 30 years. I've never heard a case where a trial goes forward, and the one side that's defending is not required to file a pleading, locking itself into a position and giving some fair notice to the other side as to what it's going to argue. It's just outrageous, unheard of. And they have not raised in the district court or on this appeal any prejudice from— We forgive them. Now, tell us why. Why do they have to suffer prejudice? Why isn't that the kind of fundamental denial— Structural error. Structural error. Thank you, Judge Reinhart. Why do they have to suffer prejudice? Because now— Those are the rules of the game. Those are the rules. And then you come up with this, tell me about this amendment, you know, this amendment that you pull out of a hat in October, this amendment to the IEP? Yes. Aren't amendments to the IEP supposed to be signed off on by the parents? Yes. Was this one signed off on by the parents? Not before it was delivered to them, no. Aren't you supposed to collaborate in the school, supposed to collaborate with the parents in developing the— Yes. Could we talk for a moment about what the amendment was? May I? No, not really. Sorry? Not really. Not really. We will get to that. I mean, just in general, as a general matter, don't amendments to the IEP have to be proposed to the parents before they are implemented? And they are given a chance to agree or disagree. Isn't that the way the rules are played, the game is played? Isn't that what the statute, what the federal law requires? Yes, and federal— The school may not implement an amendment or an IEP without participation of the parents. Isn't that right? Yes, it is. Okay. In the abstract. I'm sorry? In the abstract. I think one has to look at the amendment and the change. Why is that? Because it makes all the difference to whether it makes a difference to the parents. Where does it say that some amendments—you have to look at the amendment because some amendments they don't have to sign off on. Do you have a case? No. Do you have a statute? No, I do not. Why are you standing there making statements like that that are not supported? This is just wishful thinking? Not a bit. Not a bit. I think it is simply common sense to see what the effect of the amendment was before one decides. Does the statute say that? No. No. But the case law— I don't understand. The statute says you have to file an answer to the complaint. And you say, well, no, we don't really feel like doing it. And, you know, they have to sort of prove their prejudice. The statute says they are entitled—the parents are entitled to participate in amendments to their IEP. And you say, well, yes, the statute says that, but we don't feel like doing it. We have to look at the amendment. Why? No, I said nothing like we don't feel like doing it. I said we must look at the effect. That's what I said. And I do not have authority for it except common sense. Well, go ahead. Explain what that means. The amendment was to change the number of minutes way up. Okay. So? Four times. Okay. So? So. That is a change. Yes, it is. That means the student now participates in this program four times as often as opposed to other things. So you can't just make a change like this without changing other aspects of the program. Because you can't, I don't think, add minutes to life, can you? Sort of add 240 minutes out of nowhere. That means less time in the classroom, less time on general education, less time mainstreamed with other students, right? No, not if. You add minutes to this, you necessarily subtract minutes from something else. No. Not if. I'm sorry? Not if it has not been shown that this error was then factored into the rest of the IEP. I'm sorry. So you think you can make all these changes to the IEP without consulting the parents because it's common sense? No, I do not, and I did not say that. Well, it sounded to me a lot like that's what you said. I said there was one change, and it... It had a change, and I pointed out that you can't just make one change, that that change necessitates other changes because the minutes come from something else. No, not unless it is shown that, or we assume that, the IEP as a whole took into account the 240 per month incorrectly entered. In fact, it was understood that... Let's just make... Why would a school district make a change to an IEP and not run it by the parents? Why would they do this and spring it on them at the hearing? Why would they not notify them, particularly when they are represented by counsel and let counsel know and try to get their consent, or at least... It sounds to me like this was something that was done as a litigation tactic. We're going to sort of pull the rug out from the hay and spring it on them. That's what it sounds like to me. Well, I believe that there was a finding that it was the intention and that people understood it was the intention to provide 300 minutes a week of this service, that it was corrected to 240 a week. In other words, that the amended IEP, in effect... But you made this change in September. The hearing is not until October. Why not at least give the parents notice of the change in September when this change is made? Why withhold it? You say, well, we don't have to check with them. We can just do it on our own and all that. I don't buy any of that, but let's say we buy that. Why not at least let them have it so they can prepare for the hearing knowing that this is now a changed IEP? You don't dispute that the school failed to provide this to the parents? I do not. You don't dispute that they failed to let them know this was going on. They had no notice whatsoever. What is the justification for that? There is no justification for the procedural defect. The question, as I understand it under the cases, is did the procedural defect have the effect either of depriving the student of FAPE or denying the parent a meaningful opportunity to participate? My understanding from the record is that at the meeting, the initial meeting, it was discussed and I think the court said everybody assumed that the child was going get 300 minutes a week and the IEP, in an error, put this down as 240 a month. So the amendment redounded to the benefit of the... It sounds to me like if everybody gets 300 a week and they gave 240 a week, that it did not. In fact, that it cut back from what was agreed to. Why isn't that a sufficient reason to notify the parents to have them see whether in fact, if this was in fact supposed to conform to what happened at the IEP, that in fact it did conform. In fact, according to your own statement, it didn't conform. It fell 60 minutes short according to what you just told us. Well, you are trying to put me again in the position of justifying the failure. I cannot justify the failure. I do not justify the failure. You're certainly not justified by saying it conformed to what they agreed to at the IEP meeting. Because you said they agreed to 300. This was less than 300. This was 240. This was an hour less. So it's not like you say, well, you know, they all agreed to it up front. In fact, this short changed them some, right? And you don't think it's necessary to provide notice and let them know and at least have them object and say, give us a full 300? Your Honor, I have said now several times. But they have never gotten the 300, right? I've heard no complaint about that in the district court or otherwise. Well, I don't care what you've heard. I'm asking you a question. They in fact never got, you said they agreed to 300. The school district agreed to 300. They never got the 300, right? That is correct. So why is that itself a defect? Why isn't that? I mean, there can be no doubt that being short changed an hour a week is a material detriment. You said they agreed to 300. They gave them 240. Why isn't that alone as independent reason for reversing by your own admission? Because they have not claimed or proved any prejudice from it. Okay. We're a minute over. Thank you very much. Thank you. I just have a question. Did MC graduate from high school this year? No, Your Honor. He is on a certificate program. And so although he has reached the 12th grade, he has matriculated to a post high school program within the district. So you're looking for compensatory education? Yes, Your Honor. We are. We are looking for compensatory education. And as far as the prejudice is concerned, we did suffer prejudice. There are probably many other issues we would have raised. Did you raise an issue of receiving only 240 hours when you were promised 300? Your Honor, we were never told that we were promised 300. That is a complete misstatement of the facts. The testimony revealed that at the time of the IEP, neither our experts who appeared at the IEP nor the mother knew what was to be offered other than everything was going to stay the same, which was 240 minutes per month. We had no knowledge of the 300 until the testimony came out at the hearing. And then the service logs that were submitted indicated that 300 was not provided. And did the testimony at the hearing reveal that 300 was supposed to be provided? That's what the teacher of the visually impaired, Ms. Knitter, testified to, was that it was her intention to offer 300 minutes. But obviously the program specialist had no knowledge. That's a slightly different question than I think Judge Reinhart was asking. Did it come out at the hearing? Opposing counsel said it was agreed at the IEP. Now he's shaking his head, but that's what I heard. That it was agreed at the IEP that they would get 300 minutes. That is not true. That is not correct. What is not correct? That... He didn't say that? No, I'm sorry. That we agreed that there was an agreement that he would receive 300 minutes at the IEP. That was not a correct statement. If you wait for my question. Sorry. I understood counsel to say that that was Did that come out at the hearing? No. That did not come out at the hearing. No. Did it come out at the hearing that he was supposed to be given 300 hours or whatever it is? 300 minutes. Ms. Knitter testified that it was her intention to offer 300 minutes per week. Did it... Did she say that she was doing pursuant to what she thought the IEP required? She did not say she was doing what she thought the IEP required. She said she was performing the minutes that she was in agreement with. Okay. All right. Okay. Thank you very much. The case just argued. We'll be supporting it.
judges: Reinhardt, Kozinski, Wardlaw